## Kroger Co. v. General Teamsters Union et al.

*Reed, Smith, Shaw & McClay, Nicholas Unkovic, W. D. Armour* and *James R. Orr*, for plaintiff.

*Ben Paul Jubelier*, for defendants.

THOMPSON, J., July 5, 1951.—Plaintiff, which is a corporation of the State of Ohio, having its principal place of business in Cincinnati, Ohio, and qualified and authorized to do business in the State of Pennsylvania, operates a large number of stores in western Pennsylvania, eastern Ohio, and northern West Virginia for the sale of retail groceries, meats and produce. Plaintiff also operates two warehouses located in the City of Pittsburgh as supply centers for its stores.

Defendant labor union is the exclusive bargaining representative of approximately 10 truck drivers and helpers employed by plaintiff at its Pittsburgh warehouses to deliver merchandise to plaintiff's stores in the area above described.

The very considerable number of individual defendants named in the bill are employes of plaintiff company and members of defendant labor union.

As a result of collective bargaining with defendant labor union, a wage agreement dated October 4, 1950, and effective from October 1, 1950, to October 1, 1951, a copy of which is attached to the bill and marked exhibit A, became the agreement under which the labor relations between plaintiff and defendants are now gov-

erned. This agreement sets forth on page 1 the following:

"Whereas: The parties hereto are desirous of entering upon an agreement as to wage rates, hours and other conditions of employment and *to do away with the possibility of strikes, boycotts, lockouts and the like.*

"Now, therefore: The Employer and the Union acting by and through their duly authorized agents hereby agree as follows: . . . (Italics supplied.)

On page 2 the agreement contains, inter alia, the following:

"(c) The employer guarantees to the regular employees a weekly wage computed as follows:

"Straight time for the first forty (40) hours work per week. Time and one-half for next 5 1/3 hours work per week. If in any week the hours worked exceeded 45 1/3 such excess hours or fraction thereof shall be paid for at time and one-half.

"A guaranteed weekly wage contemplates normal delivery operation. . . ."

On page 5 there is the following:

## "ARTICLE 12.

"(a) Should it be found impossible to arrive at a mutually satisfactory adjustment of grievances, it will be turned over to a Board of Arbitration consisting of one member to be selected by the Company, one member by the Local and the two then to select a third who will act as chairman. In case the parties are unable to agree within five days to the third arbitrator, we will request the arbitrator from the United States Conciliation Service.

"(a) A Board of Arbitration in such cases shall be appointed within two weeks after the grievance is first submitted and the decision of the Board shall be given within seven days after its appointment; its decision shall be final and binding upon both parties."

And, on page 6:

## "ARTICLE 14.

"The Union agrees to uphold the rules and regulations of the Employer."

The issues presented by the bill and testimony before us involve an interpretation of the collective bargaining wage agreement and the regulations issued pursuant thereto, and specifically, *what is meant by the guaranteed weekly wage for 45 1/3 hours' work.*

In making deliveries from its warehouses to its stores plaintiff made certain scheduled trips, and defendant drivers were permitted to make choices of the trips, which they desired to make, by seniority. Some deliveries and scheduled trips were made by day and others by night and differences in allotted time existed between night and day trips, and a somewhat lesser number of night trips was deemed equivalent to a larger number of day trips.

There is now a strike of the members of defendant union in progress and plaintiff company as a result thereof has been unable to secure deliveries of merchandise to its stores and has been obliged to sell its perishable stock and merchandise at a very substantial discount and contends that none of its stores can be in operation beyond Saturday, June 30th. That date is now past and if the newspaper reports are correct, the stores of plaintiff are now closed.

The sales of plaintiff company at these stores before the strike began approximated $1,000,000 a week.

The difficulty, which brought about the strike, had its origin on June 13, 1951, when Lawrence Hannon, who is one of the individual defendants named in the bill, was directed by plaintiff to report for work on the following evening, to wit, June 14, 1951. Lawrence Hannon had during the current week beginning June 10, 1951, worked for 41 1/3 hours and claimed that he

was entitled to payment under the wage agreement for 45 1/3 hours' pay.

It was the contention of plaintiff that this defendant was not entitled to the maximum hours of pay, to wit, 45 1/3 hours, where he had worked for a lessor period of time, and plaintiff had other work ready for him, and that the maximum payment was only to be made for a lesser number of hours work when the employer had no further work available for the employe during the wage week in question.

Defendant, Lawrence Hannon, under instructions from defendant labor union, declined to report for work on June 10, 1951, to work out the additional four hours, and was advised in consequence that he would not be paid for the guaranteed wage period of 45 1/3 hours but only for the 41 1/3 hours which he had completed.

This difference became a matter of discussion between plaintiff and the labor union, and plaintiff requested that the issue be submitted to arbitration in accordance with the provisions of article 12 of the wage contract. The labor union defendant declined to arbitrate this issue unless the Kroger Company first paid Hannon the amount in dispute, and ordered a strike of its members, which began on June 19, 1951, and is still in effect.

The bill prays that a temporary restraining order, to be followed by preliminary injunction, be issued by this court restraining defendants from calling, or causing to be called, or continuing a strike which has been ordered, and from coercing and intimidating the other employes of the Kroger Company, and from impeding or hampering the Kroger Company in the transaction of its business.

The bill was first presented to Judge Kennedy, presiding in the assignment room of this court, and after efforts had been made to secure an adjustment of the

grievances, Judge Kennedy declined to issue a temporary restraining order merely on injunction affidavits, but directed that the case be heard as on an application for a preliminary injunction before the present trial judge on June 27, 1951.

It is now the contention of plaintiff company that one of the purposes of the wage agreement, exhibit A, was "to do away with the possibility of strikes" by arbitration under the provisions of article 12, and that defendants under this agreement could not lawfully order and carry out a strike until these differences had been submitted to abitration.

It is the contention of defendants, as we understand it, that plaintiff in failing to pay defendant, Lawrence Hannon, for the maximum period of 45 1/3 hours a week when he had worked for a lesser period, had violated the wage agreement, and therefore, under the provisions of the Act of June 9, 1939, P. L. 302, amending the Labor Relations Act of June 2, 1937, P. L. 1198, was not entitled to have any grievance under the agreement arbitrated, and that in consequence the right to strike was available to defendants and that this court could not by an injunction decree interfere with such a strike.

We are referred specifically to the closing portion of section 4 (a) of the Act of 1937 as amended by the Act of 1939, P. L. 304, which, after setting forth the cases where an injunction may be issued, reads as follows:

"Provided, however, that the complaining person has not, during the term of the said agreement, committed an act as defined in both of the aforesaid acts as an unfair labor practice or violated any of the terms of said agreement."

If the provision of the Act of 1939 above quoted were given the effect for which the learned counsel of defendants contends, it would be difficult to conceive of any circumstance where arbitration would be available

to either of the parties involved in a labor dispute under the labor contract now before us because obviously one party or the other would be contending as here that the contract had been violated. The parties to the agreement before us have expressed a desire "to do away with the possibility of strikes" and have said that any labor dispute should be submitted to arbitration.

The purpose of this agreement "to do away with the possibility of strikes, etc." is one which, we think, the general public would heartily endorse. If for present purposes we assume that defendant labor union is right in this dispute, we do not think that such a difference was intended by the Act of 1939 to wipe out all the rights of the offending party under the wage agreement.

It seems to us that the present dispute is of a character that was intended by all the parties to this agreement to be submitted to arbitration. We are reluctant to so construe this agreement as to make its arbitration provisions futile and practically surplusage.

It developed in the course of the hearing before us that a controversy between the parties, which had no connection with the present controversy, had arisen during the month of May of the year and had been submitted to arbitration and was not yet determined. By this act both of the parties to the agreement have given it a construction, which is in harmony with plaintiff's position.

Much testimony was offered before us bearing on the merits of the existing controversy. We do not think that this testimony should properly be considered by us at this time or until the preliminary question—whether arbitration should first be undertaken, is determined. In the discussion before the strike was ordered, and again during the progress of this hearing, defendants stated that if the amount due Hannon was first paid

they would consent to arbitration. Apparently, both parties are afraid to surrender the battlefield as a condition precedent to an armistice.

We are of the opinion that equity has jurisdiction of this dispute and, after reviewing the transcript of the testimony which is now before us, that an injunction should issue restricting the continuance of the strike called and enforced by defendants until the matter at issue has been submitted to arbitration under the provisions of article 12 of the wage agreement.